**UNITED STATES of America,**
**Plaintiff–Appellant,**

**v.**

**Benjamin Acardo JAMES,**
**Defendant–Appellee.**

**No. 91–6034.**

United States Court of Appeals,
Eleventh Circuit.

March 19, 1993.

Harry C. Wallace, Linda Collins Hertz, Harriett R. Galvin, Asst. Attys. Gen., Miami, FL, for plaintiff-appellant.

Lori Barrist, Alison Marie Igoe, Asst. Federal Public Defenders, Miami, FL, for defendant-appellee.

Before KRAVITCH and BIRCH, Circuit Judges, and CLARK, Senior Circuit Judge.

KRAVITCH, Circuit Judge:

In this appeal, we are asked to interpret the cost provisions of the federal law that makes it a crime to "knowingly and willfully communicate a false distress message to the United States Coast Guard." 14 U.S.C. § 88(c) (1990). We hold that, under the plain meaning of the statute, persons who knowingly and willfully cause the Coast Guard to expend resources on a false search and rescue mission are liable for *all* *costs* incurred by the Coast Guard in that mission, from start to finish.

## I.

Early in the morning of January 7, 1991, Benjamin Acardo James contacted the United States Coast Guard Station in Miami, Florida by radio. After identifying himself as "James Bacaardo,"[1] James stated that he was stranded in his vessel, the SEA JACKET, approximately 200 miles offshore between the Bahamas and Miami and that foreign-speaking people, apparently from a capsized vessel, were trying to board his vessel from a life raft. James also stated that he was an employee of the United States Customs Service who was stationed in Homestead, Florida. After James told the Coast Guard that his boat was overloaded and that he would start to throw people off his boat if the Coast Guard did not rescue him, the Coast Guard upgraded his call from an "alert" to a "distress" call.

The Coast Guard dispatched a 42-foot boat to rescue James. However, the boat's direction-finding equipment indicated that James' vessel was not at sea but near Miami. A second 42-foot boat was then dispatched. Its direction-finding equipment confirmed the first boat's reading.

At this point, the Coast Guard suspected that James' call was a hoax, but continued to pursue his calls as a real search and rescue mission.[2] When James threatened to kill the people who allegedly were surrounding his boat, the Coast Guard sent out a helicopter to pinpoint James' location. The helicopter's direction-finder also tracked James' radio signal back to Miami. While the helicopter crew worked to find the exact location of James' vessel, the crewmen returned to the base station where they boarded smaller boats and proceeded up the Miami River.[3]

After the helicopter crew had narrowed the search area to a location near East Coast Fisheries, the crewmen in the boats found James and watched him as he continued to send false distress signals. James was arrested at approximately 3:30 a.m., nearly three and one-half hours after the Coast Guard first received his call. The crewmen noted that James smelled of alcohol and found beer cans all over the boat.

James was charged with communicating a false distress message to the Coast Guard in violation of 14 U.S.C. § 88(c) (Count I); impersonating an officer or employee of the United States in violation of 18 U.S.C. § 912 (Count II); and making a false statement in violation of 18 U.S.C. § 1001 (Count III). The court granted James' motion for acquittal as to Count II and the jury convicted James on Counts I and III. James was sentenced to two concurrent terms of probation for a total of two years with a special condition that he reside in a community treatment center for six months.

The government requested that, under 14 U.S.C. § 88(c), James be assessed the full costs incurred by the Coast Guard in

---

1. James spelled out the name Bacaardo by saying, "B as in boy, A as in apple, C as in colostomy, a-a-r-d-o."

2. At James' sentencing hearing, Lieutenant Mark Bobotek, an attorney for the Coast Guard, testified as follows:

    Once the Coast Guard undertakes a rescue mission, it has an obligation to pursue it as a search and rescue mission until we are a hundred percent sure or close enough that

you might say beyond a reasonable doubt that it's not a hoax.
(R. 2 at 7).

3. Up to this point, the mission had lasted approximately one and one-half hours. At trial, the crewmen involved in the rescue mission testified that as they began to realize that James' call was a hoax, their mission changed from a "search and rescue" to one involving the Coast Guard's law enforcement powers. (R. 3 at 19–20, 52–53; R. 4 at 89, 99).

locating and arresting him. This amounted to approximately $5800—$3800 for the use of the helicopter and $2000 for use of the boats. The district court found that there was no need for a search and rescue mission "after the early stages of the proceeding" and that James should only be required to pay $1000 to the Coast Guard.

## II.

■ By sending out a false distress signal to the Coast Guard, James fell within the proscriptions of Title 14 of the United States Code, Section 88(c), which provides:

> An individual who knowingly and willfully communicates a false distress message to the Coast Guard or causes the Coast Guard to attempt to save lives and property when no help is needed is—
>
> (1) guilty of a class D felony;
>
> (2) subject to a civil penalty of not more than $5000; and
>
> (3) liable for all costs the Coast Guard incurs as a result of the individual's action.

Thus, James' financial liability to the Coast Guard rests on an interpretation of subsection (3). James and the government agree that this provision should be interpreted according to its plain language. *See Greyhound v. Mt. Hood Stages, Inc.*, 437 U.S. 322, 330, 98 S.Ct. 2370, 2735, 57 L.Ed.2d 239 (1978); *United States v. Bradshaw*, 840 F.2d 871, 874 (11th Cir.), *cert. denied*, 488 U.S. 924, 109 S.Ct. 305, 102 L.Ed.2d 324 (1988). This is particularly so where, as here, there is no clearly expressed legislative intent to the contrary. *United States v. Rawlings*, 821 F.2d 1543, 1545 (11th

Cir.), *cert. denied*, 484 U.S. 979, 108 S.Ct. 494, 98 L.Ed.2d 492 (1987).[4]

■ The parties disagree, however, on the meaning of the plain language. James argues, as he did below, that the cost provision is included in a section that deals exclusively with "saving lives and property," 14 U.S.C. § 88, whereas the section that follows, 14 U.S.C. § 89, deals with "law enforcement," but does not contain a cost provision.[5] Thus, when the Coast Guard's search and rescue mission moved from "saving lives and property" to more of "law enforcement," James' liability for costs incurred by the Coast Guard was cut off.[6]

■ The government, on the other hand, contends that Congress could not have been more clear in using the words "all costs the Coast Guard incurs" to express its intent. This argument is bolstered by the Supreme Court's decision in *United States v. Monsanto*, 491 U.S. 600, 109 S.Ct. 2657, 105 L.Ed.2d 512 (1989), in which the Court construed the criminal forfeiture statute, 21 U.S.C. § 853, as containing no exemption for assets used to pay attorneys' fees. That statute provides that a person convicted under federal drug abuse prevention and control laws " 'shall forfeit ... any property' that was derived from the commission of these offenses." *Id.* at 607, 109 S.Ct. at 2662 (citing 21 U.S.C. § 853(a)). In a subsequent section of the statute, the sentencing court is directed to order the forfeiture of "all property" described in § 853(a). The Court wrote, "Congress could not have chosen stronger words to express its intent that forfeiture be mandatory in cases where the statute applied, or

---

**4.** The cost provision was added to 14 U.S.C. § 88 in 1990 under the Federal Maritime Commission Authorization Act of 1990, Pub.L. 101–595, 104 Stat. 2979, 2989 (Nov. 16, 1990). This provision has no recorded legislative history.

**5.** 14 U.S.C. § 89 provides in pertinent part:

(a) The Coast Guard may make inquiries, examination, inspections, searches, seizures, and arrests upon the high seas and waters over which the United States has jurisdiction, for the prevention, detection, and suppression of violations of laws of the United States.

**6.** At the sentencing hearing, the district court made the factual finding that "there was no need for a search and rescue mission after the early stages of th[e] proceeding...." (R. 2 at 17). Thus, despite the fact that we review the court's interpretation of the statute under a *de novo* standard, *see United States v. Herrera*, 931 F.2d 761, 762 (11th Cir.1991), we will not disturb the sentencing court's findings of fact unless we find them clearly erroneous. *United States v. Odedina*, 980 F.2d 705, 707 (11th Cir. 1993). The government has not shown that the court's findings were clearly erroneous.

broader words to define the scope of what was to be forfeited." *Id.*

We agree with the government that the correct interpretation of the cost provision in 14 U.S.C. § 88(c) requires that James be held liable for all costs the Coast Guard incurred in responding to James' false distress message. James clearly violated the statute in sending out such a false distress signal, and this unlawful act set in motion a chain of events which resulted in efforts directed at his apprehension. In other words, *but for* James' actions, the Coast Guard would not have expended any resources on a search and rescue mission and subsequent apprehension. Therefore, James should be responsible for the costs of the operation from beginning to completion.

In addition, as evidenced by the facts in this case, it is not always clear when the Coast Guard has moved from "saving lives and property" to "law enforcement," particularly when the Coast Guard's actions are part of one continuous operation. We would expect the Coast Guard to pursue a distress call, even when it suspects it is a hoax, until all doubts are resolved. As Coast Guard Lieutenant Bobotek testified at the sentencing hearing:

> Even when we think its [sic] a hoax, we still have to pursue it as a true search and rescue mission. Even at the time the helicopters were doing their direction-finding on the Miami River, until we had Mr. James pinned down and it was apparent what we really had there, we were still in a search and rescue response posture, although we did suspect we were in a law enforcement situation at some point.

(R. 2 at 7–8). Furthermore, as was pointed out at trial and at the sentencing hearing, the use of Coast Guard units to investigate hoaxes—which must be done at the time the calls are being sent—means that those units are not available to respond to genuine rescue needs. One who causes the Coast Guard to waste its limited resources chasing down false distress signals should be held liable. Congress chose the assessment of costs as one part of that liability and we give full effect to Congress' intent.

Finally, James is not assisted by the rule of lenity, which requires courts to strictly construe criminal statutes to encompass only that conduct which Congress intended to criminalize. As this court consistently has recognized:

> The principle of lenity is " 'not an inexorable command to override common sense and evident statutory purpose.' " Indeed, the doctrine of lenity should not be invoked until a court "seiz[ing] everything from which aid can be derived, ... [is] left with an ambiguous statute."

*United States v. Hill,* 863 F.2d 1575, 1582–83 (11th Cir.1989) (citations omitted). James, in fact, argues that the statute is clear on its face, and thus should be interpreted by its plain meaning. We agree, and thus hold that the rule of lenity is inapplicable in this case.

Accordingly, we REVERSE the decision of the district court and REMAND for further proceedings consistent with this opinion.