RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 14a0085p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

No. 13-3970

*v.*

DANIK SHIV KUMAR,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland
No. 1:12-cr-00504-1—Sara E. Lioi, District Judge.

Decided and Filed:  April 22, 2014

Before: ROGERS, McKEAGUE, and WHITE, Circuit Judges.

_____

**COUNSEL**

**ON BRIEF:**  Edmund W. Searby, Lisa M. Ghannoum,  BAKER & HOSTETLER LLP,
Cleveland, Ohio, for Appellant.  Michelle M. Baeppler, UNITED STATES ATTORNEY'S
OFFICE, Cleveland, Ohio, for Appellee.

McKEAGUE, J., delivered the opinion of the court, in which ROGERS, J., joined, and
WHITE, J., joined in part.  WHITE, J. (pp. 11–13), delivered a separate opinion concurring in
part and dissenting in part.

—————————————

**OPINION**

—————————————

McKEAGUE, Circuit Judge.  After pleading guilty to making a false report of a boat in distress, in violation of 14 U.S.C. § 88(c), defendant Danik Shiv Kumar was sentenced to three months in prison and ordered to pay restitution in the total amount of $489,007.70.  In this appeal, he challenges the restitution order on three grounds.  Finding no error, we affirm the judgment of sentence.

**I**

Defendant Danik Kumar was nineteen years old in March 2012 and was enrolled in his first year in the Aviation Technology Program at Bowling Green State University in northwestern Ohio.  A licensed pilot, Kumar was given the assignment of flying alone at night from Wood County Airport near Bowling Green to Burke Lakefront Airport in Cleveland, and then back again, after 10:00 p.m. on March 14, 2012.  The flight plan required him to fly over a portion of Lake Erie.  The first leg of the flight was uneventful.  On the return trip, Kumar observed what he believed to be a flare rising from a boat on the lake below.  When he reported this sighting to Cleveland Hopkins International Airport, he was instructed to fly lower for a closer look.  As he did so, Kumar could not see a boat.  Yet, fearful of sounding stupid and hurting his chances of one day becoming a Coast Guard pilot, he reported that he saw additional flares going up.  He described a 25-foot fishing vessel with four people aboard wearing life jackets with strobe lights activated.

Kumar's detailed report of four mariners in distress prompted a massive search and rescue mission by the United States Coast Guard, with help from the Canadian Armed Forces. During the next twenty-one hours, four vessels and two aircraft participated in the search, including the *Thunder Bay*, a 140-foot Coast Guard cutter with a crew of about twenty; three smaller rescue boats, each with a crew of four; a 65-foot search and rescue helicopter with a crew of four; and the Canadian CC130 Hercules airplane with a crew of seven.  Over a month later, on

April 25, Kumar admitted to a Coast Guard investigator that his report of a boat in distress had been false.

Kumar was indicted on the charge of making a false distress call, a class D felony per 14 U.S.C. § 88(c)(1). Under § 88(c)(3), one who makes such a false distress call to the Coast Guard is "liable for all costs the Coast Guard incurs as a result of the individual's actions." Kumar pleaded guilty on January 17, 2013. He was sentenced on August 16, 2013 to a prison term of three months and a three-year term of supervised release, and was ordered to pay restitution in the amounts of $277,257.70 to the United States Coast Guard, and $211,750.00 to the Canadian Armed Forces. On appeal, Kumar contends the district court was without authority to order restitution to the Canadian Armed Forces and erred in its calculation of costs incurred by the Coast Guard as a result of his actions.

## II

Whether imposition of restitution is permissible under the circumstances is reviewed de novo, but the amount of restitution is reviewed for abuse of discretion. *United States v. Boring*, 557 F.3d 707, 713 (6th Cir. 2009). An abuse of discretion occurs when a ruling is based on an error of law or a clearly erroneous finding of fact, or when the reviewing court is otherwise left with the definite and firm conviction that the district court committed a clear error of judgment. *United States v. Clay*, 667 F.3d 689, 693 (6th Cir. 2012); *United States v. Batti*, 631 F.3d 371, 379 (6th Cir. 2011).

### A. "All Costs Incurred as a Result"

Prior to imposing sentence, the district court received briefing from the parties on the restitution issues and conducted two hearings. At the first hearing, each side presented the testimony of a financial expert. The government called Commander Kevin Mohr, Chief of Financial Analysis for the Coast Guard. Commander Mohr testified about the Coast Guard's reimbursable standard rates, adopted pursuant to Office of Management and Budget Circular No. A-25 ("OMB A-25") and generally applicable to all Coast Guard units across the nation.

OMB A-25 establishes federal policy regarding fees assessed for government resources. The objective of the policy, consistent with 31 U.S.C. § 9701(a), is to "ensure that each service,

sale, or use of Government goods or resources provided by an agency to specific recipients be self-sustaining." R. 28-3, OMB A-25 § 5.a, Page ID # 416. It provides that "user charges will be sufficient to recover the full cost to the Federal Government . . . of providing the service, resource or good." *Id.* at § 6.a.2(a), Page ID # 417. "'Full cost' includees all direct and indirect costs to any part of the Federal Government of providing a good, resource, or service." *Id.* at § 6.d.1. These costs include direct and indirect personnel costs, physical overhead, management and supervisory costs, and costs of enforcement, collection and research. *Id.* The Coast Guard's standard reimbursable rates are designed to implement these purposes. They are set forth in Commandant Instruction 7310.1M. R. 28-1, Page ID # 390.

Commander Mohr testified that the standard reimbursable rates are used for budget formulation and for obtaining reimbursement—from federal and non-federal agencies and from responsible parties—for use of or damage to Coast Guard assets. Mohr said the standard rates are also used in seeking restitution in cases like this. The standard rates represent determinations of the hourly costs of using various Coast Guard assets and personnel. The rates are comprised of various components, including direct costs (e.g., labor, employee benefits, fuel, maintenance); support costs (e.g., support activities received from area commands, districts, groups); general and administrative costs (e.g., legal services, payroll processing); pension benefit adjustment (e.g., retirement pay and medical expenses); operating asset depreciation; and operating asset cost of capital. *Id.*, Encl. (1), Page ID # 393.

Mohr explained that the costs Kumar is liable for are determined by multiplying the respective hourly rates by the number of hours the Coast Guard assets and personnel involved in this 21-hour search and rescue operation were deployed. This sum, $277,257.70, Mohr testified, represents the "full cost" sustained by the Coast Guard as a result of Kumar's false report. In Mohr's opinion, this "full cost," as defined in OMB A-25 and implemented by Commandant Instruction 7310.1M, represents "all costs" Kumar is liable for under 14 U.S.C. § 88(c).

Kumar contends this approach places too much emphasis on "all costs" while ignoring the "as a result" limitation. He argues that § 88(c) creates a restitution remedy and that the "as a result" language operates to limit recovery to actual losses proximately caused by his false report. Kumar contends he is liable under § 88(c) only for those costs directly attributable to his

actions, not for the "indirect costs" included in Commander Mohr's calculation, i.e., support costs, general and administrative costs, pension benefit adjustment, operating asset depreciation, operating asset cost of capital.  According to his expert, forensic accountant Dennis S. Medica, when the Coast Guard's costs are limited to "operating costs" (i.e., by deducting from the Coast Guard's estimate all fixed costs that would have been incurred irrespective of Kumar's actions), the recovery is reduced to $118,216.

At the sentencing hearing, the district court confirmed that neither side objected to the other's mathematics.  Nor did Kumar challenge any particular items of indirect costs claimed by the Coast Guard.  The dispute, then and now, is essentially a legal one, revolving around interpretation of § 88(c).  The question is whether "all costs incurred as a result" limits the Coast Guard's recovery to direct costs or also includes indirect costs associated with the deployment of resources as a result of Kumar's false report.  R. 44, Sent. tr. at 120-23, page ID # 742-45.

There appears to be little published case law directly on point.  The government argues that its position here mirrors the approach uniformly taken in courts across the country in enforcing § 88(c).  *See e.g.*, *United States v. Sanders*, 511 F. App'x 463 (6th Cir. 2013) (8-hour search with helicopter involving 38 personnel; restitution of $53,316); *United States v. Emil*, 56 F.3d 65, 1995 WL 322455 (6th Cir.) (restitution of $5,177.28); *United States v. James*, 986 F.2d 441 (11th Cir. 1993) (holding "all costs" includes costs associated with search and rescue mission and subsequent apprehension); *United States v. Crockett*, No. 3:09-cr-345 (N.D. Ohio 2010) (restitution of $112,735.70); *United States v. Haun*, No. 5:06-cr-18 (N.D. Fla. 2006) (holding "all costs" means full reimbursement; restitution of $140,279).  The restitution amounts ordered in these cases are less than what the Coast Guard claims in this case, but the government contends this is simply due to the fact that Kumar's false report, detailed and credible as it was, triggered a massive and more expensive response.

Kumar cites other case law showing that, traditionally, restitution has been employed not to punish the wrongdoer, but to restore the victim, whose recovery is therefore limited to actual losses proximately caused by the wrongdoing.  *See Hughey v. United States*, 495 U.S. 411, 416 (1990); *United States v. Gamble*, 709 F.3d 541, 546 (6th Cir. 2013); *United States v. Evers*, 669 F.3d 645, 659 (6th Cir. 2012).  Kumar is right, and this argument has strong appeal.

However, none of these cases addressed the law we must construe, 14 U.S.C. § 88(c).  As the Court noted in *Hughey*, "in all cases involving statutory interpretation, we look first to the language of the statute itself."  *Hughey*, 495 U.S. at 415.  Section 88(c) does not mention "restitution."  Yes, it functions in a manner akin to restitution, and Kumar's judgment of sentence refers to restitution, but the statutory language we interpret does not.  Nor does it limit the Coast Guard's recovery to its "losses."  It makes one who gives a false report liable for *all costs* incurred by the Coast Guard as a result of his actions.

There is no dispute that Kumar's false report proximately caused the mobilization of one Coast Guard aircraft and four vessels, together with their crews and related onshore personnel during a 21-hour period.  Nor is there any dispute about the full cost of these resources to the Coast Guard, as measured in hourly reimbursable rates in accordance with accounting standards adopted by the Federal Accounting Standard Advisory Board.  Nor is there any dispute that these accounting standards define "full cost" as the total amount of resources used to produce the product or service, including direct and indirect costs.  R. 28-5, Statement of Federal Financial Accounting Standards 4, ¶ 89, Page ID # 452.  This definition is consistent with the policy established by 31 U.S.C. § 9701(a) and OMB A-25, § 6, discussed above.

Commander Mohr conceded on cross-examination that Kumar's false report did not result in increased indirect costs to the Coast Guard, but recovery under § 88(c) is not limited to increased costs.  Section 88(c) renders Kumar liable for *all costs* associated with resources mobilized as a result of his false report.  We therefore find no error in the district court's ruling that Kumar is liable under § 88(c) for the full cost of the service rendered by the Coast Guard, $277,257.70.[1]  This is an onerous burden to place on the shoulders of a young man, but it is consonant with Congress's manifest intent to deal harshly with such hoaxes, in order to deter the diversion of critical resources away from true emergencies.

---

[1]As indicated above, Kumar did not challenge below and has not challenged on appeal any particular items of indirect costs claimed by the Coast Guard, and our opinion should not be construed as meaning that "all costs" necessarily entitles the Coast Guard to recovery of all claimed indirect costs in every case.

**B.  Authority to Order Restitution to Canadian Armed Forces**

The judgment of sentence also orders Kumar to pay restitution in the amount of $211,750 to the Receiver General for Canada for the Canadian Armed Forces' contribution to the search and rescue mission.  In making this order, the district court recognized that 14 U.S.C. § 88(c) does not confer authority to order reimbursement to any party other than the United States Coast Guard.  Accordingly, after receiving supplemental briefing from the parties, the district court ruled that it had discretion under 18 U.S.C. § 3583(d) to order restitution as a condition of supervised release.  Kumar challenges this ruling, contending that 14 U.S.C. § 88(c), specifically addressing the circumstances under which liability for costs resulting from a false report may be imposed, controls over the more general provision of 18 U.S.C. § 3583(d).

"One of the most basic canons of statutory interpretation is that a more specific provision takes precedence over a more general one."  *United States v. Perry*, 360 F.3d 519, 535 (6th Cir. 2004).  Yet, canons of construction are resorted to as guides only where there is an apparent conflict between laws, *see id.* (citing *United States v. Castro-Rocha*, 323 F.3d 846, 851 (10th Cir. 2003)), or some other ambiguity that requires the court to go beyond the plain meaning of a statute's text to discern legislative purpose. Again, "in all cases involving statutory interpretation, we look first to the language of the statute itself."  *Hughey*, 495 U.S. at 415.

Here, there is neither conflict nor ambiguity in the language of these statutes.  Section 88(c) is a very specific statute rendering the one who knowingly and willfully makes a false report liable for all costs incurred by the Coast Guard.  It clearly and unambiguously limits this entitlement to the Coast Guard only.  This case presents a dispute about the meaning of "all costs," but the scope of the entitlement is otherwise clear:  no victim other than the Coast Guard is entitled to all costs under § 88(c).

Section 3583(d) is, in material respects, similarly clear, albeit wordier.  It gives the sentencing court discretion to prescribe, as a condition of supervised release, any condition that may be prescribed as a condition of probation under 18 U.S.C. § 3563(b) (i.e., including restitution under 18 U.S.C. § 3556) or any other condition it considers to be appropriate, so long as it is reasonably related to the sentencing factors prescribed in 18 U.S.C. § 3553(a), involves no

greater deprivation of liberty than is reasonably necessary, and is consistent with any pertinent policy statements issued by the Sentencing Commission.

Clearly, the Canadian Armed Forces is a victim of Kumar's offense, and Kumar does not challenge the "appropriateness" of the district court's exercise of discretion to order restitution under the above paraphrased language.  Rather, Kumar's challenge is limited to the notion that the district court's broad discretionary authority under § 3583(d) is trumped or preempted by the more specific § 88(c).  Yet, there being no conflict between the two statutes and no material ambiguity in their language, there is no reason why the two statutes cannot be deemed to coexist and co-operate.  There is no support for the notion that § 88(c) reflects a congressional purpose to exclude victims other than the Coast Guard from recovery of losses caused by a false report. We find no error in the district court's determination that it had authority under § 3583(d) to order Kumar to pay restitution to the Canadian Armed Forces.

### C.  Amount of Restitution

Finally, Kumar contends that even if the district court had authority to order him to pay restitution, the court abused its discretion by doing so based on an inadequate record.  He contends the written communications from the Canadian Armed Forces presented by the government lack sufficient indicia of reliability to support the order of restitution.  Indeed, no witness testified to the Canadian Armed Forces' losses at the sentencing hearing.  While there is no dispute that the Canadian Armed Forces contributed a CC130 Hercules aircraft with seven-man crew to the search and rescue mission for some 12 hours, the record of its losses is less than ideal.  It consists of several letters and copies of e-mail messages.

In the first of these, a letter dated December 7, 2012, Major Marty Zimmer claimed the cost associated with operating the CC130 aircraft in this particular search and rescue mission was $211,750.  R. 25-11, Page ID # 349.  Subsequent communications purported to clarify that this figure was limited to operating costs (i.e., fuel, maintenance, parts, crew and ground and administrative support) based on an hourly rate of $17,500.  *See e.g.*, R. 31-5, Sworn Letter, Maj. Zimmer, dated August 8, 2013, Page ID # 587.  When additional support costs were added, pursuant to Department of National Defence policy, to determine the "full cost" of the mission,

the hourly rate increased to $30,792, and the total costs sought to be recovered rose to $372,583 (CAD). *Id.*

It thus appears that the Canadian Armed Forces, like the U.S. Coast Guard, classifies reimbursable rates variously, as either "direct operating costs" or "full cost." Faced with these two figures submitted in support of the Canadian claim, $211,750 and $372,583, the district court ordered Kumar to pay the lesser amount, finding the government had not carried its burden of proving the Canadian Armed Forces' entitlement to the larger amount, full cost, by a preponderance of the evidence.

Kumar contends this order is not supported by sufficient reliable evidence. He acknowledges that a district court may consider hearsay evidence in sentencing, *see Elson*, 577 F.3d at 732, but he argues he was denied fair opportunity to refute it inasmuch as no witness was presented by the government. Also, he argues that the wide discrepancy between the estimates offered indicates the evidence lacks the "minimal indicia of reliability" required to meet due process. *Id.*

The district court found the discrepancy between the two figures submitted by Major Zimmer adequately explained. We agree. That is, the discrepancy does not undermine the reliability of the information presented. Properly understood, the Canadian cost-calculating methodology is similar to the methodology employed by the Coast Guard. Kumar did not challenge the Coast Guard's methodology. It is thus not readily apparent how the lack of a live witness to explain the Canadian methodology materially prejudiced Kumar's opportunity to refute it. Kumar's challenge to the Coast Guard's claimed costs went strictly to the legal question of whether all costs were recoverable or only those costs directly attributable to his false report. Under 14 U.S.C. § 88(c), as explained above, the Coast Guard is entitled to all costs. However, the Canadian Armed Forces cannot recover under § 88(c). Its recovery is limited to restitution, i.e., recovery of actual losses proximately caused by Kumar's wrongdoing. The $211,750 figure adopted by the district court reflects "the cost directly related to employing this aircraft on this particular SAR incident." R. 25-11, Maj. Zimmer letter dated Dec. 7, 2012, Page ID # 349. The $211,750 figure, confirmed by Major Zimmer's sworn letter of August 8, 2013, thus appears to be a reasonable and reliable approximation of the Canadian Armed Forces' actual

losses directly resulting from Kumar's false report.  We therefore find no abuse of discretion in the district court's order of restitution in this amount.

### III

Accordingly, defendant Kumar's claims of error are denied and the district court's judgment of sentence is **AFFIRMED**.

---

**CONCURRING IN PART AND DISSENTING IN PART**

---

HELENE N. WHITE, Circuit Judge, concurring in part, dissenting in part. I concur in the majority's determinations that the district court had authority to order restitution in favor of the Canadian Armed Forces and that the amount is adequately supported by the record. I dissent from the affirmance of the amount of the obligation imposed under 14 U.S.C. § 88(c).

The question is whether 14 U.S.C. § 88(c), which imposes liability for "all costs the Coast Guard incurs as a result of" a false distress message, contemplates the use of the standard reimbursable rates ("user charges") adopted pursuant to 31 U.S.C. § 9701 and Office of Management and Budget Circular No. A-25. I do not believe it does.

As noted by the majority, OMB A-25 directs that user charges include "an appropriate share of" both direct and indirect costs, including items such as management and supervisory costs, consulting, an annual rate of return, costs of establishing standards, any required environmental impact statements, physical overhead, utilities, depreciation of buildings, costs of supplies, insurance, and unfunded retirement costs. In short, OMB A-25 requires an agency such as the Coast Guard to compute for the open market the "full cost" of its services, which includes all the direct and indirect costs that go into running, maintaining, housing, improving and managing the Coast Guard.

14 U.S.C. § 88(c), enacted in 1990, long after § 9701 became law, is a specific statute speaking directly to the penalties to be imposed on a person who makes a false report to the Coast Guard. Its clear purpose is to require the offender to pay all costs resulting from the false report. Had Congress intended that those costs include general overhead and indirect costs of the type included in user charges established under § 9701 it would have been a simple matter for Congress to refer to § 9701, or any schedule of user charges promulgated pursuant to that provision. However, § 9701 is not cross referenced and user charges are not mentioned. Instead, the focus of § 88(c) is all costs *resulting* from the false report.

Indirect costs and overhead are appropriately included in calculating the "full cost" of a benefit or service for the purpose of calculating a figure that approximates what that benefit or service might cost on the open market, which is the purpose of § 9701. However, these indirect costs are not what one would normally associate with "all costs the Coast Guard incurs as a result of" the false report. Overhead and administrative costs related to research, headquarters, payroll processing, environmental impact studies, building maintenance, and other similar expenses are hardly costs incurred as a result of Kumar's false report.

Further, I find little guidance in the cases cited by the majority. *United States v. Sanders*, 511 F. App'x 463, 465 (6th Cir. 2013), an unpublished opinion, simply states that the defendant was ordered to pay $53,306 in restitution to the Coast Guard. The amount assessed was not a subject of the appeal, and the opinion includes no discussion of how that amount was calculated. Nor does the district court record in that case support the majority's position. The $53,306 figure is found in a spreadsheet attachment to the sentencing transcript as Exhibit B. This spreadsheet lists the personnel involved in the search, the number of hours they were involved, their pay grade, and the hourly rate. It also provides an hourly rate for equipment. There is no information regarding the source of the hourly rates.

*United States v. Emil*, 56 F.3d 65, No. 94-1871, 1995 WL 322455, at *1 (6th Cir. May 26, 1995), too, is an unpublished opinion that simply states the amount of restitution ordered by the district court, $5,177.28, without any discussion. *United States v. Crockett*, No. 3:09-cr-345 (N.D. Ohio Jan. 19, 2010), is a district court case in which restitution of $112,735.70 was imposed under § 88(c), but nothing in the record indicates how the amount was calculated.

*United States v. James*, 986 F.2d 441 (11th Cir. 1993), does address the amount of restitution ordered. But the issue there was whether the district court properly included costs associated with locating James' boat after the Coast Guard realized that his distress reports were a hoax. James argued that the additional amounts were not properly assessed because § 88(c) by its terms is limited to costs the Coast Guard incurs when attempting "to save lives and property when no help is needed," and § 89, which deals with law enforcement, has no provision for the repayment of costs incurred as a result of law enforcement efforts. The court rejected James' argument, concluding that § 88(c) "requires that James be held liable for all costs the Coast

Guard incurred in responding to James' false distress message." *James*, 986 F.2d at 444. The court continued, "*but for* James' actions, the Coast Guard would not have expended any resources on a search and rescue mission and subsequent apprehension," and observed that the line between search and rescue on the one hand and law enforcement on the other may be blurred as a mission develops the sense that there may be a hoax, but continues to search and verify that no one is in danger before terminating a search. *Id.* (emphasis in original). *James* has no relevance to the question whether user charges calculated pursuant to § 9701's all-inclusive approach are properly used to determine the costs incurred as a result of a false distress message.[1]

*United States v. Haun*, No. 5:06-cr-18-001/RS (N.D. Fla. Aug. 16, 2006), a northern district of Florida case, did involve user charges established pursuant to § 9701. However, in that case the defendant challenged the use of "outside government" rates rather than the lesser "in government" rates. The district court determined that "all costs" properly included the pension and other costs that were in the outside-government rate but not the in-government rate. The threshold question whether it is proper to the use § 9701 rates to determine amounts owed under § 88(c) was assumed, but not addressed.

Section 88(c) speaks of all costs incurred as a result of the false report; in contrast, § 9701 and OMB A-25 speak of including all costs, direct and indirect, in an effort to price a good or service as it would be priced on the open market and account for all overhead costs that are necessary to run the overall operation but do not result from the fact that the particular good or service was produced or rendered. User charges calculated pursuant to the latter provisions include elements that are not related to a false distress signal and produce an inflated cost figure. I would remand for an adjustment of the penalty imposed under § 88(c).

---

[1]I note also that the *James* court stated that § 88(c) has "no recorded legislative history." However, in the Congressional Record, Representative Studds of Massachusetts, the sponsor of the bill, stated: "If you make a hoax call to the Coast Guard, and the Coast Guard sends out a helicopter or a patrol boat in response, you will be liable for every penny of the Coast Guard's increased operating expenses resulting from the call." 136 Cong. Rec. 7270 (daily ed. Sept. 10, 1990) (H7269-02, H7270).