NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0750n.06

No. 13-3315

**FILED**
Sep 30, 2014
DEBORAH S. HUNT, Clerk

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

UNITED STATES OF AMERICA,

     Plaintiff-Appellee,

v.

BERNICE STEPHENS-MILLER,

     Defendant-Appellant.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO

BEFORE:    BOGGS and CLAY, Circuit Judges; COHN, District Judge.[*]

**CLAY, Circuit Judge.** Following a jury trial, Defendant Bernice Stephens-Miller was convicted of mail fraud in violation of 18 U.S.C. § 1341, theft of social security disability benefits exceeding $1,000 in violation of 18 U.S.C. § 641, and making materially false statements to a government official in violation of 18 U.S.C. § 1001. After conclusion of the jury trial, the district court held a sentencing hearing and sentenced Defendant to ten months of imprisonment and three years of supervised release for each of her offenses, which sentences would run concurrently. Additionally, the district court imposed a restitution award requiring Defendant to repay $170,047.47 to the Social Security Administration ("SSA"), the Bureau of Workers' Compensation ("BWC"), and Ohio Edison. Defendant timely appealed her convictions, the prison sentences, and the total restitution amount.

---

[*]Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation.

For the reasons that follow, we **AFFIRM** Defendant's convictions and sentence.

## I.

## BACKGROUND

**A.    Factual Background**

In 1976, Defendant suffered a work-related injury while employed by Ohio Edison. She sustained serious damage to her thigh, lower abdomen, and back after an accident at work. Following this injury and after receiving significant medical treatment, Defendant attempted to return to work but was unable to do so. Defendant began receiving disability benefits from Ohio Edison in December 1976. Defendant sent information regarding her disabilities to Ohio Edison through the U.S. Mail.

In 1977, Defendant submitted a claim to the Ohio Bureau of Workers' Compensation ("BWC") for temporary total disability based on her physical disabilities as well as depression and anxiety. In 1988, after receiving years of medical treatment, her doctor found that she would be unable to fully recover from her injuries, and she began receiving permanent total disability benefits.[1] Defendant received checks for each of these payments through the mail.

Defendant filed an application for SSA disability benefits and received those benefits in the amount of $18,083 from February 3, 2006 through May 3, 2008.

In 2006, the BWC began an undercover investigation into Defendant's work-related activities. Their investigation resulted in the belief that Defendant had owned and operated

---

[1]On her benefits application, Defendant acknowledged that "she is aware that if . . . her disability should . . . improve after the Industrial Commission has granted her an award for permanent and total disability and be able to return to gainful employment, he or she must immediately notify the Bureau of Workers' Compensation . . . of the date he or she returned to work." (*Id*. at PageID# 1167.)

various stores and worked in those stores since 1996. This conclusion led to the filing of the criminal charges at issue in this case.

### 1. Dr. Parikh's Testimony

At trial, Defendant's psychiatrist, Dr. Anil Parikh, testified regarding Defendant's physical and mental conditions. Dr. Parikh testified that he believed Defendant suffered from chronic physical pain as well as depression and anxiety resulting from her work-related injury. When asked about Defendant's condition between September 1996 and June 2008, Dr. Parikh stated that Defendant "continued to have significant symptoms of depression with many of her vegetative symptoms . . . and she had continued to have significant amounts of pain." (R. 124, 12/11/2012 Trial Tr., at PageID# 1839.) Some of the vegetative symptoms included crying spells, feelings of hopelessness, isolation, and suicidal inclinations. Additionally, Dr. Parikh testified that Defendant suffered from psychosis. He explained some of her psychosis-related symptoms:

> When she's psychotic, she totally isolates herself. She doesn't show up for her appointment. She doesn't take her medicine. Her hygiene is not the same . . . and she feels like the world is out to get her, and she is feeling paranoid and hallucinating because God is telling her something, what's going to happen tomorrow.

(*Id*. at PageID# 1843.)

Dr. Parikh treated Defendant for over two decades, helping her deal with both her chronic physical pain and mental disabilities. He testified at trial that Defendant's condition would fluctuate from day to day. He explained that

> on some days during that condition that particular time frame may be okay, and part of that is because she has learned with the group counseling, with individual counseling, with family support, with medication to cope with some of these things.

3

> So you may find her some days in someplace that she might be accepting the illness and behaving in a socially acceptable way. But other times, when you take a deep value and look inside her brain and ask her really important questions, you feel like this is a person who is totally psychotic who has lost touch with reality. She's hearing God's voice, God is telling her what's going to happen tomorrow. She is hearing things. She thinks people are out to kill her. She's making, you know, plans to prevent people from killing her and all this.

> So this is a woman who . . . on one occasion may look perfectly normal and on another occasion she may be totally psychotic.

> And the only way to really get a feeling of it, and I have during the time frame, is to really look at her from a longitudinal perspective instead of looking at her in one time frame.

(*Id*. at PageID# 1841–42.) Testimony from Defendant's family members and friends confirmed many of these symptoms and the unpredictability of her illness. Defendant's daughter, April Stephens, testified that Defendant experienced extreme mood swings and was depressed and isolated. Defendant's husband, Donald Miller, testified that Defendant seemed depressed most of the time.

Dr. Parikh attempted a number of strategies to relieve some of Defendant's symptoms, including medications and individual and group counseling. Despite these attempts, Defendant continued to feel isolated and suffered from her disabilities. As a result, Dr. Parikh "recommended . . . that she should stop isolating herself and get involved with some activities outside of the house which may include . . . going to hospitals, going to Red Cross, going to any place, including any place where she felt comfortable." (*Id*. at PageID# 1846–47.) At the same time, Dr. Parikh was concerned that Defendant's psychosis would prevent her from getting involved with activities outside of the home. He recommended that Defendant visit her family's boutique to get out of the house and interact with others in a safe and comfortable environment. He believed that such an environment

4

> would be a lot more flexible [than other options]. If she was there, if she has to go to bathroom for three times in an hour, [which was related to her disability,] that wouldn't impair or prevent her from doing that.
>
> It would be a situation where she can come and go. It wouldn't be more stress for her because that's one thing that had happened was isolation was opposite of what we wanted. We wanted her to be in a safe place where she would have flexibility and she could come and go and do whatever is necessary . . . .

(*Id*. at PageID# 1848–49.) Throughout his testimony, Dr. Parikh maintained that he believed Defendant was unable to work throughout the entire relevant time period. He explained that although Defendant may have performed some work-related activities while visiting her family's boutiques, Defendant would not have been able to do the same work in any other place of employment.

Both Defendant and the Government presented a number of other witnesses and additional evidence during the trial.

### 2.     April Stephens' Testimony

Devotice Imports ("Devotice") is a boutique that Defendant alleges was owned and operated by her daughter April from 1995 to 1998. "Devotice" is Defendant's middle name. The Ohio Secretary of State's records indicate that this store was registered in April's name. April testified at trial that her mother did not own, operate, or work at the store during the period of time relevant to this case. April stated that she allowed Defendant to visit the store and occasionally perform some work-related activity such as draw sketches for customers, but claimed that Defendant never received compensation for her work. Although April claimed that she owned and operated the store, she could not recall specific information such as the store's hours of operation, how much money was spent on inventory and rent, and where advertisements were placed in the media.

### 3.    Testimony of Two Prior Store Employees

Two prior employees of the store, Francis Perkins and Tiffany Martin, also testified that April owned the store and that Defendant only visited the store from time to time. They stated that Defendant did not have any work responsibilities in the store. Perkins testified that she was paid by April and that April delivered clothes to Perkins' home from 1997 to 1998. However, Perkins also testified that if packages arrived while the store was closed, they were delivered to Defendant's residence.

### 4.    Testimony of Defendant's Sister

Defendant's sister, Tivia Snipes, testified at trial that Defendant's daughter April opened the store in 1995 and then moved to California in 1996. She could not recall many details from this time period. Snipes claimed that she ran the shop following April's move to California until 1998, when the store was robbed, and that Defendant never owned the store. She denied any knowledge that the boutique existed in any form between 1998 and 2005, and she claimed that the store reopened in 2005 and later became Devotice & La'Char when Charlene Dawkins partnered with Defendant's husband.[2] She asserted that her sister, Defendant, would visit the store, but that she did not interact with any customers. Finally, Snipes testified that while she was living in Florida between 1998 and 2007, she performed alteration work and ran the store for Dawkins during her visits to Ohio. She stated on direct examination that she volunteered at the store and then later said she was occasionally paid in cash or check for her work.

---

[2]Snipes could not recall Dawkins' first name at trial. (*Id*. at PageID# 2042.)

## 5. Donald Miller's Testimony

From 2005 to 2008, Defendant and her family were involved in another store named Devotice & La'Char. Defendant's husband Donald[3] testified that he decided to open the store with Charlene Dawkins because he wanted something to do after he retired, which did not occur until 2009. The Ohio Secretary of State's records indicate that the store was registered to Miller and Dawkins. Insurance for the store was procured in Dawkins' name.

Miller testified at trial that Devotice & La'Char was his store. He stated that he used the inventory from the store previously owned by Defendant's Daughter—Devotice—to start a women's clothing store of his own. During this time, he also worked full-time as a machinist. He explained that after opening the store, he entered into a partnership with Dawkins. He testified that he often brought his wife along on trips where he would purchase clothing for the store, but that he never went to New York City for a buying trip. He and Defendant went on a buying trip to Las Vegas, and he explained that Defendant only came along for a vacation. The record contains identification badges from one of these trips, one of which identified Defendant as a "guest" and the other identified Miller as "retailer." He claimed that during the relevant time period, his wife only visited the store to socialize, not for employment purposes. He also stated that he brought his wife along when he met with one of the landlords, but that she did not take part in discussion of the lease terms.

## 6. Charlene Dawkins' Testimony

Dawkins also testified at Defendant's trial, stating that Defendant offered to go into business with her in 2000. Dawkins explained that Defendant previously had a clothing store named Devotice and that when they began their partnership together in 2005, they renamed the

---

[3]Defendant married Donald Miller in 2003. (*Id*. at PageID# 2071.)

store "Devotice & La'Char" to reflect both of their names. Dawkins testified that she and her daughter went to the store together on a few occasions to purchase some African clothes for her daughter's wedding. She stated that Defendant sold her a number of articles for her daughter's wedding, including the wedding crown used during the wedding ceremony. Although Dawkins could not recall when her daughter got married and when they visited the store, she remembered that this had occurred sometime before 2004. When asked who was working in the store on those particular occasions when she visited the store, Dawkins replied that Defendant had been working there. She stated specifically that "Bernice had to open it and let us in. It wasn't open for business. Wasn't nobody there working, but we went -- we met her there and she let us in." (R. 122, Trial Tr. at PageID# 1521.)

Dawkins testified that she and Defendant worked in the store, assisting customers and completing sales, generally between the hours of 11:00 a.m. and 5:00 or 6:00 p.m. However, as Defendant points out in her brief, Dawkins took responsibility for handling the store's checking account, obtained credit cards for the store, and kept track of the inventory book. Additionally, Dawkins stated that Defendant frequently altered clothing for the store. While neither of the women were compensated for their work during the relevant time period, Dawkins explained, they reinvested the proceeds from their sales to purchase more inventory for the store. Dawkins also testified that she and Defendant went on multiple buying trips to New York City, Las Vegas, and Chicago.

### 7. Testimony from Landlords

Three of the landlords for the stores' various locations also testified at trial. Each of these individuals stated that Defendant negotiated the leases for the boutique locations and that

when they visited the stores during the period of time relevant to this case, they observed Defendant assisting customers or actively participating in business-related activity.

Perry Fruscella, who was the landlord for the East Cuyahoga Falls location, was not aware that anyone other than Defendant owned the store. He claimed that Defendant was the only person from whom he collected rent. Fruscella also testified that he did not discuss the lease or payment terms with anyone other than Defendant. Fruscella visited the store occasionally to collect rent. When asked what he believed Defendant's role was at the store, he responded, "Well, she . . . was the one that talked to the customers and took care of the business. Occasionally she had somebody else there." (R. 121, Trial Tr. at PageID# 1300.)

Nick Alexander, the landlord for the store's North Main Street location, also testified at trial. He stated that Defendant rented the store from January 2005 until September 2006. He testified that when he first spoke with Defendant, "[s]he physically came to the body shop [which he owned] with a gentleman questioning the rental property." (*Id.* at PageID# 1317.) He later clarified that the gentleman was Defendant's husband Miller. He remembered receiving a business card from either Defendant or Donald. That business card, which was presented at trial, had "Bernice" written across the front. Also submitted into evidence were two letters of recommendation supporting Defendant's application for the lease, mentioning Defendant by name. Alexander claimed that although the lease agreement was actually signed by Donald, he dealt with Defendant with respect to the tenancy. Alexander also testified that over the course of the 18-month lease period, he visited the store on approximately twelve occasions. He stated that "[o]n more than one occasion, [Defendant] was taking care of customers the way any business owner would." (*Id.* at PageID# 1337.) After being asked what he believed was

Defendant's role at the store, Alexander stated, "I assume it was like mine at the body shop as owner/operator." (*Id*.)

Joseph Polk, the third landlord, who leased the Brittain Road location of the store, also testified at Defendant's trial. First, he identified Defendant as his tenant. He explained that Defendant was the person who initially inquired about renting the unit, and during that call, they discussed the terms of the agreement. Polk stated as follows:

> Well, the way it was explained to me when I met with [Defendant] and spoke with [Defendant] was that she described the arrangement as a partnership between her – I'm sorry – between Charlene Dawkins and her husband Donald Miller, and the thing was in this case my really primary contact was Bernice Miller.

(*Id*. at PageID# 1379.) He also testified that before they executed the rental agreement, Defendant described the store and its business model, which was then incorporated into the rental agreement.

## 8. Surveillance Evidence[4]

During a two-year period beginning in 2006, BWC's Special Investigations Department conducted surveillance of Devotice & La'Char. Two agents—Marcea Miles and Shannon Bryant—were primarily responsible for the investigation. At Defendant's trial, the government presented a great deal of evidence to demonstrate that during this time period, Defendant participated in a substantial amount of work-related activity at the store. For example, on June 27, 2006, August 24, 2006, September 6, 2006, March 1, 2007, March 8, 2007, March 9, 2007, and June 28, 2007, Miles conducted "spot checks" of the store and saw two cars in the lot, one of which belonged to Defendant and the other belonged to Dawkins. On those occasions, Miles did not enter the store and did not testify as to how long Defendant's car remained in the lot. On

---

[4]Much of this surveillance summary was taken from Defendant's own brief.

September 6, 2006, September 7, 2006, and March 21, 2007, Miles made time-lapse recordings of the store from across the street. These recordings showed Defendant coming and going throughout the day.

On September 8, 2006, Bryant made an unrecorded contact with Defendant. When Bryant arrived, Defendant was in the back of the store. After Defendant returned, Bryant asked about the store's former location of the store, specifically "if her store was also the store that used to be on East Cuyahoga Falls Boulevard, and she stated that yes, it was and she had been at that location for nine years." (R. 123, 12/10/2012 Trial Tr., at PageID# 1595–96.) Bryant was actually aware of the store's existence at that location because she realized that she was previously in a wedding where the clothing had been purchased from Defendant's family store when it was located on East Cuyahoga Falls Boulevard. To confirm this belief, she obtained a magazine called "Brides of Color," which, in its Fall and Winter, 1996 edition, displayed an image of a member of that wedding party. And Bryant testified that she had personal knowledge that the clothing "was purchased from the Devotice store located on East Cuyahoga Falls Boulevard." And the lower-right corner of the page indicates who was responsible for preparation of the attire: "Cover wardrobe by Devotice Imports." The magazine also indicates that the headpiece and gown worn by the bride were designed by Devotice Imports. The magazine contains an advertisement for "Devotice Imports, Afrocentric clothing." Also in that same magazine, two pages depicted the bride and groom from that same wedding and indicated that "Bernice from Devotice" designed the gown. The article stated that "Kim [(the bride)] asked Bernice of Devotice to design . . . her gown, and Bernice agreed." Finally, the magazine depicted a second, separate wedding in which Devotice and Defendant were referenced as having provided the apparel to the wedding party and to some of the family members. At the end of this

11

visit, Defendant encouraged Bryant to return to the store to see their summer and fall items. The length of this visit is unclear from the record.

Again, on September 14, 2006, Miles and Bryant entered the store pretending to be customers. During that visit, Defendant sat at a desk, answered the phone, and relayed information to Bryant about purchasing items. Both Dawkins and Defendant explained to Miles and Bryant that they purchased the store's inventory on buying trips in Las Vegas and other locations. During this visit, Defendant answered the phone and did not appear to have difficulty communicating.

On April 5, 2007, Bryant and Miles again entered the store to make another undercover audio recording. They were greeted by Defendant when they arrived at the store, and Dawkins was in the back of the store. Defendant showed them around the store and they discussed some of the items on display. Defendant answered the agents' questions regarding African-style clothing, explaining that they did not have room for those clothes at the current location, which was much smaller than the store's previous location. Defendant also indicated that she had made one of the wedding crowns in the store and that she likes to do "extraordinary weddings." (*Id*. at 1603–04.) Defendant rang up the agents' purchases and wrote a receipt for one of the purchases. After Bryant had completed her purchases in the store, Defendant gave Bryant ten to twelve business cards and asked that she give them to her friends. These business cards stated, "Devotice & La'Char's Unique International Apparel, a Don Miller enterprise." The card also included the names "Donald and Bernice Miller" and "Charlene Dawkins." Bryant testified that during each of their three interactions, Defendant held herself out as the business owner.

On March 15, 2007 and March 30, 2007, Miles again conducted surveillance at the store. On the 15th, after Miles saw Defendant arrive at the store, she called to inquire about prom

dresses. Defendant answered the phone and stated that they did, in fact, carry prom dresses. On the 30th, Miles entered the store and was greeted by Dawkins. The written report documenting that visit stated that Defendant was with a visitor/customer. Dawkins told Miles that Defendant had just finished making a wedding dress. Miles ended her visit by purchasing jewelry, which Defendant rang up on the register. After Defendant placed the jewelry in a bag, Donald Miller arrived at the store.

### 9. Miscellaneous Testimony

The government also presented testimony of police officer Leonard Mitchell, who testified that in August 2006, he drafted a report regarding a residential break-in and a motor vehicle theft in response to a call from Defendant. In the motor vehicle theft report, which was entered into evidence, Defendant was listed as the victim of the theft. In that report, Defendant's employer was identified as "self," her occupation was listed as "owner," and her employment hours were marked as varied. That form was signed by Defendant, indicating that she "verifie[d] that the information of th[e] report [was] accurate and true." (*Id*.)

### 10. Disability Benefits-Related Inquiries

Throughout the period during which she received disability benefits, Defendant responded to a number of inquiries regarding her condition and her ability to work. In February 1997, Defendant responded to an inquiry from Ohio Edison indicating that she had not returned to work. She received and responded to similar inquiries in 2000, 2001, and 2003. In 1997, she also responded to BWC's written correspondence, indicating that she had not returned to work. She again received contact letters in 1999 and 2000 and a questionnaire in 2002 from BWC to which she responded that she hadn't returned to work and was not volunteering. In 2003 and 2006, she received additional mailed correspondence from the BWC to which she responded that

she hadn't been working. In a 2007 interview with two agents, Defendant was asked "[Are you or have you been working in any capacity full-time, part-time, self-employed, in any capacity?" She responded, "No, not at all." (R.123, 12/10/2012 Trial Tr., at PageID# 1677.) Additionally, from February 1985 through 2000, Defendant reported no change in her condition and maintained that she had limited walking abilities and needed assistance with bathing. She also indicated that her hobbies were watching television, listening to the radio, and oil painting. She also stated that she had social contact with her family and drove occasionally. She agreed to notify the SSA if her condition improved.

## II. Procedural History

On December 7, 2010, Defendant was charged with three crimes: (1) mail fraud, in violation of 18 U.S.C. § 1341, related to benefits she received from the BWC and Ohio Edison between September 1, 1996 and June 7, 2008; (2) theft of social security disability benefits exceeding $1,000, in violation of 18 U.S.C. § 641, related to benefits she received from February 2006 through May 2008; and (3) making materially false statements to government officials, in violation of 18 U.S.C. § 1001.

Before Defendant's trial began, the district court ordered her to undergo a competency evaluation. The court-appointed psychologist found Defendant competent to stand trial, although he also concluded that she "has a deeply engrained pattern of social and occupational instability [and] . . . [has] odd and magical beliefs that influence her behavior and relationships with others." (R. 70-1, Sealed Letter from Dr. James A. Orlando, at PageID# 593.) The jury trial commenced on December 6, 2012, and on December 13, 2012, the jury returned guilty verdicts on each of the charges.

At a sentencing hearing before the district court, Defendant objected to the judge's calculation of the total amount of benefits received during the relevant time period. Based on the loss amount and restitution calculations, the district court found that Defendant's base offense level was seven, but that the total loss amount of $170,047.47 required a ten-level enhancement pursuant to the Sentencing Guidelines. *See* U.S.S.G. § 2B1.1(b)(1)(f). Additionally, the district court rejected the two-level enhancement for obstruction of justice that was requested by the government and included in the presentence report ("PSR"). Ultimately, the district court varied downward and sentenced Defendant to ten months of incarceration on all counts to run concurrently, followed by three years of supervised release on all counts, which would also run concurrently. Additionally, the district court ordered Defendant to pay restitution in the amount of $170,047.47 to the SSA, the BWC, and Ohio Edison.

Defendant filed a timely notice of appeal. She asserts the following claims on appeal: (1) the district court erred by failing to instruct the jury on the defense of good faith as to her charges of theft of public funds and making a false statement to a government official; (2) the evidence was insufficient to establish that Defendant possessed the requisite intent to defraud the government; and (3) the district court imposed a procedurally unreasonable sentence and improperly calculated the loss and restitution amounts owed by Defendant.

## II.

## DISCUSSION

### A. Good Faith Defense Instruction

#### 1. Standard of Review

This Court reviews challenges to a district court's jury instructions under an abuse of discretion standard. *United States v. Williams*, 612 F.3d 500, 506 (6th Cir. 2010). More

specifically, this Court reviews "the legal accuracy of jury instructions de novo and the denial of a proposed jury instruction for an abuse of discretion." *Arch Ins. Co. v. Broan-NuTone, LLC*, 509 F. App'x 453, 459 (6th Cir. 2012) (internal citation and quotation marks omitted). Under this standard,

> [a] district court's refusal to deliver a requested instruction is reversible only if that instruction is (1) a correct statement of the law, (2) not substantially covered by the charge actually delivered to the jury, and (3) concerns a point so important in the trial that the failure to give it substantially impairs the defendant's defense.

*United States v. Williams*, 952 F.2d 1504, 1512 (6th Cir. 1991). This Court "review[s] jury instructions 'as a whole, in order to determine whether they adequately informed the jury of the relevant considerations and provided a basis in law for aiding the jury in reaching its decision.'" *Dixon v. Houk*, 737 F.3d 1003, 1010 (6th Cir. 2013) (quoting *United States v. Frederick*, 406 F.3d 754, 761 (6th Cir. 2005)). "A jury instruction which states the law with substantial accuracy and fairly submits the issues to the jury will not provide grounds for reversal." *In re Air Crash Disaster*, 86 F.3d 498, 520 (6th Cir. 1996) (internal quotation marks omitted). Therefore, this Court will only reverse a conviction based on an improper jury instruction "if the instructions, viewed as a whole, were confusing, misleading, or prejudicial." *United States v. Edington*, 526 F. App'x 584, 590 (6th Cir. 2013) (internal quotation marks omitted).

## 2. Analysis

Defendant alleges that the district court erred in only instructing the jury regarding the good faith defense as to the mail fraud charge rather than also providing an instruction on this defense for the other two charges. She asserts that all three of the offenses for which she was charged are specific intent crimes; therefore, a good faith defense instruction was required because good faith is inconsistent with knowledge, willfulness, or intent to defraud.

Additionally, Defendant claims that because "this *is* a case where the words 'good faith' were so important that their underlying meaning could not otherwise be conveyed," the district court erred in specifically instructing the jury that the specific defense does not apply to the latter two offenses. Pet'r's Br. at 34. In response, the Government asserts that such a defense instruction was not warranted and that the district court, therefore, did not abuse its discretion in refusing to provide such an instruction.

Each of the crimes asserted against Defendant—mail fraud, theft of government property, and false statement—is, in fact, a specific intent crime. *See United States v. Frost*, 125 F.3d 346, 354 (6th Cir. 1997) (explaining that "[a] defendant does not commit mail fraud unless he possesses the specific intent to deceive or defraud"); *United States v. Hurt*, 527 F.3d 1347, 1350– 51 (D.C. Cir. 2008) ("Theft of government property under 18 U.S.C. § 641 is a specific intent crime. . . . A person who harbors a good faith but mistaken belief that property belongs to him lacks the necessary *mens rea* for theft [under 18 U.S.C. § 641]") (internal citation omitted); *United States v. Aarons*, 718 F.2d 188, 190 (6th Cir. 1983) ("Title 18 U.S.C. § 1001 makes it unlawful to *knowingly* and *willingly* make any false statements or representations . . . . It was the congressional intent to protect governmental departments and agencies from the perversion which might result from the deceptive practices described in th[e] statute.") (internal citation omitted) (emphasis added). Therefore, a district court must instruct the jury as to the *mens rea* requirement for each offense. However, Defendant takes this a step further to assert that it was an abuse of discretion for the district court to refuse to provide a jury instruction on the good faith defense for two of the three charges against her.

"We regularly look to whether jury instructions mirror or track the pattern instructions as one factor in determining whether any particular instruction is misleading or erroneous." *United*

*States v. Damra*, 621 F.3d 474, 499 (6th Cir. 2010). Defendant sought introduction of the good

faith defense, which is found in Chapter 10 of the Sixth Circuit Pattern Instructions, a chapter

governing "Fraud Offenses." In the Introduction to Fraud Instructions, the Sixth Circuit

Committee on Pattern Criminal Jury Instructions explains that the good faith instruction is to be

"used in conjunction with the elements instructions for mail, wire, and bank fraud only; it does

not articulate a general good faith defense." Sixth Circuit Pattern Instruction § 6.08, Committee

Commentary (2013 ed.). Additionally, Chapter 6 on defenses includes a cross reference to

Instruction 10.04:

> Instruction 10.04 states a good faith defense [is] to be used in
> conjunction with the elements instructions for mail, wire and bank
> fraud only; it does not articulate a general good faith defense.
> Instruction 10.04 is cross-listed here in Chapter 6 because it covers
> a defense, but its applicability is limited to those fraud crimes in
> Chapter 10.

*Id*. at 159. Therefore, the Sixth Circuit's Pattern Instructions confirm that the district court did

not abuse its discretion in failing to provide the requested instructions.

Even if the district court had erred in failing to include a good faith defense instruction as

to the second and third charges against Defendant, a long line of cases suggests that the error was

harmless because a trial court need not instruct on good faith if it provides proper instructions to

the jury regarding the intent required for commission of the underlying offenses. *See, e.g*.

*United States v. Pomponio*, 429 U.S. 10, 12–13 (1976) (concluding that "[a]n additional

instruction on good faith was unnecessary" where the trial judge had properly instructed the jury

regarding the *mens rea* elements of an offense). In *United States v. McGuire*, 744 F.2d 1197,

1201–02 (6th Cir. 1985) (en banc), this Court held that although the trial court should have

provided a good faith instruction, that error was harmless because "[t]he instructions with regard

to specific intent adequately informed the jury of the defendants' theory of the case, and properly

placed the burden of proof of intent on the government." *Id*. at 1202. *See also United States v. Hildebrandt*, 961 F.2d 116, 119 (8th Cir. 1992) (holding that a jury instruction as to knowingly making or using a false, fictitious, or fraudulent writing was sufficient, even without a good faith instruction); *Damra,* 621 F.3d at 502 (explaining that "a jury's conclusion that a defendant acted willfully . . . would necessarily negate any possibility that the defendant acted in good faith.") (internal quotation marks omitted).

Interestingly, Defendant relies on *United States v. Hurt*, 527 F.3d 1347, 1350–51 (D.C. Cir. 2008), to demonstrate that "a person who harbors a good faith but mistaken belief that property belongs to him lacks the necessary *mens rea* for the theft." However, Defendant fails to acknowledge that the D.C. Circuit decided in that case that even without an explicit instruction regarding the good faith defense, the jury instructions "that the government must prove beyond a reasonable doubt that the defendant stole the money knowing that it was not his, and with the intent to deprive the owner of the use or benefit of the money," *id*. at 1351-52 (internal quotation marks omitted), were sufficient to communicate the *mens rea* requirement.

In the instant case, the district court's instructions were sufficient to capture the required *mens rea* elements for the second and third counts of theft of government property and false statement. The district court instructed the jury as follows with regard to the charge of theft of government property:

> Title 18, United States Code, Section 641 makes it a crime for anyone to embezzle, steal, or convert any money or other property belonging to the United States having a value of more than 1,000.
>
> For you to find the defendant guilty of this crime you must be convinced that the government has proved each of the following beyond a reasonable doubt:

First, that the money described in the indictment, $18,083, belonged to the United States Government and had a value in excess of 1,000 at the time alleged.

[S]econd, that the defendant knowingly embezzled, stole, and converted such money to the defendant's own use.

Three, that the defendant did so knowing the property was not hers and with intent to deprive the owner of the use of the money.

If you find from your consideration of all the evidence that each of these elements has been proved beyond a reasonable doubt, then you should find defendant guilty. If, on the other hand, you find from your considerations of all the evidence that any one of these elements has not been proved beyond a reasonable doubt, then you should find the defendant not guilty.

(R. 126, PageID# 2297.) Additionally, the district court instructed the jury regarding the third charge of false statement as follows:

Defendant is charged with the offense of making a false statement in a matter within the jurisdiction of the United States Government. For you to find defendant guilty of this charge, or this offense, you must find that the government has proved each and every one of the following elements beyond a reasonable doubt:

A, first, the defendant made a statement.

B, second, defendant was – the statement was false.

C, third, the statement was material.

D, fourth, that the defendant acted knowingly and willfully.

And E, fifth, that the statement pertained to a matter within the jurisdiction of the executive branch of the United States Government.

Two, now I will give you more detailed instructions on some of these terms.

A, a statement is false or fictitious if it was untrue when it was made, and the defendant knew it was untrue at the time. A statement is fraudulent if it was untrue when it was made, the

20

defendant knew it was untrue at the time, and the defendant intended to deceive . . . .

C, an act is done knowingly and willfully if it is done voluntarily and intentionally, and not because of mistake or some other innocent reason . . . .

If you have a reasonable doubt about any one of these elements, then you must find defendant not guilty of this charge.

(R. 126, PageID# 2299.)  Following these instructions, the district court instructed the jury as to the good faith defense:

> The good faith of the defendant is a complete defense to the allegations of mail fraud in Count 1 of the indictment because good faith on the part of the defendant is, simply, inconsistent with an intent to defraud.
>
> Two, a person who acts, or causes another person to act, on a belief or an opinion honestly held is not punishable under the mail fraud statute.

(R. 126, PageID# 2300–01.)  The district court continued by offering further details regarding the defense.  Next, the district court requested that the jurors fix the jury instructions form by crossing off reference to the second and third charges of theft of public money and false statement listed under the good faith defense heading, explaining that good faith only related to the mail fraud charge.  *Id*. at PageID# 2301.  Specifically, the court stated,

> And just take your pen if you have one and I'll fix this, and delete 'The theft of public money statute or the false statement statute.' This pertains – right now I'm just talking about good faith as relates to mail fraud.
>
> So if you would take your pen and we'll correct it and get a correct copy . . . but it should read 'A person who acts or causes another person to act on a belief or an opinion honestly held is not punishable under the mail fraud statute merely because,' that's how it should read, 'the belief or opinion turns out to be inaccurate, incorrect or wrong.'  We're talking about mail fraud.

(*Id*.)

Although the district court made it clear that the good faith defense did not apply to the latter two charges, the instructions clearly indicate that the offenses are specific intent crimes and the jury must find that Defendant had the requisite knowledge and intent to be found guilty of the offenses. Additionally, the district court's instructions properly placed the burden of proof on the government. As the Supreme Court stated in *Pomponio*, 429 U.S. at 13, "[t]he trial judge . . . . adequately instructed the jury on willfulness. An additional instruction on good faith was unnecessary." In the instant case, the district court adequately instructed the jury as to all elements of the three charged crimes.

Defendant attempts to distinguish her case from *McGuire*, suggesting that the district court's correction of the jury instructions confused the jury and "stripped [the issue of good faith] from the jury's consideration, relative to the theft of public money and false statement charges." Pet'r's Br. at 34. *McGuire* is not, however, distinguishable. The district court did not spend very much time articulating reasons for why the good faith defense did not apply to the latter two offenses. Rather, the court simply requested that the jurors revise their instructions forms. The bulk of the conversation regarding the appropriateness of the good faith defense instruction had concluded before the jurors were brought into the courtroom. Therefore, that discussion did not prejudice Defendant in any way. Additionally, defense counsel was given ample opportunity to argue that the government failed to establish each of the elements of the case. In fact, defense counsel argued in his closing as follows regarding Defendant's *mens rea*:

> And so I'm asking you to take that into account when you make the decision. When she's checking these forms, is she trying to defraud or does she hold an honest belief in the first count that "I'm not on the payroll, I'm not making money, I'm around my family and I'm following doctor's advice here. I'm not defrauding. The doctor's telling me I can't go work outside this unique environment" . . . .

22

> Ms. Stephens-Miller acted in good faith to what her doctor told her. And when she went out of town, no matter what anyone says to you, "We went to Chicago, we went here," what does the evidence show? It shows she went as a guest . . . .
>
> Bernice Stephens-Miller was around her family throughout this whole thing. She was not employable, and she was told she was not employable, and her doctor told her – told you she's not employable.
>
> So is she trying to defraud? She's not getting any money out of this. Is she trying to defraud when she checks those forms, or is it merely consistent with what her doctor told her and what her doctor told her family that would be good for her?
>
> And I think when you do that, you're going to find that this is not a person that commits mail fraud and theft of public money and lying. She behaved with the way her doctor told her she should behave, in an environment that was unique and set up.

(PageID# 2273.) Finally, the jury instructions *were* sufficiently clear regarding the *mens rea* requirements for each of these offenses.

Even if this Court had found that the district court's instructions, viewed as a whole, were confusing or misleading, it does not appear that the lack of instruction on good faith for the latter two charges was prejudicial to Defendant. The jury was properly instructed regarding the good faith defense for the mail fraud charge, yet the jury still convicted Defendant on that count. Each of the charges for which Defendant was convicted stem from the same dishonest statements to the government regarding her ability to work and her actual work activity. If the jury found that she lacked good faith for the mail fraud offense, that finding would likely have carried over to the other two charges as well.

Therefore, this Court finds that the district court did not abuse its discretion in refusing to extend a good faith defense instruction to the latter two charges.

**B.      Sufficiency of the Evidence**

Defendant twice moved for judgment of acquittal during her trial—once after the close of the government's case and once after the close of all evidence.  She claimed that the government presented insufficient evidence to support her convictions.  She asserted then, as she asserts now on appeal, that the government did not prove beyond a reasonable doubt that Defendant, who suffers from serious mental disabilities including psychosis, possessed the requisite intent to defraud and deceive the government.

**1.      Standard of Review**

This Court reviews *de novo* a district court's denial of a motion for judgment of acquittal. *United States v. Graham*, 622 F.3d 445, 448 (6th Cir. 2010).  A Defendant asserting such a claim carries "a very heavy burden," *United States v. Soto*, 716 F.2d 989, 991 (6th Cir. 1983), because this Court does not "ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt," *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979) (internal quotation marks omitted).  Instead, this Court must determine "whether after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Id*.  The Court applies this favorable view to both circumstantial and direct evidence, *United States v. Humphrey*, 279 F.3d 372, 378 (6th Cir. 2002), and "[c]ircumstantial evidence alone, if 'substantial and competent,' may support a verdict and need not 'remove every reasonable hypothesis except that of guilt,'" *United States v. Keeton*, 101 F.3d 48, 52 (6th Cir. 1996) (quoting *United States v. Stone*, 748 F.2d 361, 363 (6th Cir. 1984)).

Finally, "[i]n undertaking this analysis, this court neither independently weighs the evidence, nor judges the credibility of witnesses who testified at trial."  *United States v. Talley*,

164 F.3d 989, 996 (6th Cir. 1999). "When faced with conflicting testimony, the trier of fact, not the appellate court, holds the responsibility . . . fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw inferences from basic facts to ultimate facts . . . and we are loath to override [the factfinder's] conclusion. '" *United States v. Boring*, 557 F.3d 707, 711-12 (6th Cir. 2009) (internal citations and quotation marks omitted). Additionally, "It must also be borne in mind that the question of intent is generally considered to be one of fact to be resolved by the trier of the facts . . . and the determination thereof should not be lightly overturned." *United States v. Daniel*, 329 F.3d 480, 487 (6th Cir. 2003) (ellipsis in original).

**2.     Analysis**

Each of the crimes of which Defendant was convicted and sentenced includes both a *mens rea* component and an *actus reus* component. To convict a defendant of mail fraud, the government must prove each of the following beyond a reasonable doubt: "(1) a scheme or artifice to defraud; (2) use of mails in furtherance of the scheme; and (3) intent to deprive a victim of money or property." *United States v. Warshak*, 631 F.3d 266, 310 (6th Cir. 2010) (internal quotation marks omitted). "A plaintiff must also demonstrate *scienter* to establish a scheme to defraud, which is satisfied by showing the defendant acted either with a specific intent to defraud or with recklessness with respect to potentially misleading information." *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 404 (6th Cir. 2012). To support the second conviction of theft of government property, the Government "must establish that the defendant (1) knowingly (2) stole or converted to the use of another (3) something of value of the United States." *United States v. Hall*, 549 F.3d 1033, 1038 (6th Cir. 2008). To support the third charge of making false statements to a federal agency in violation of 18 U.S.C. § 1001, the government had to prove beyond a reasonable doubt that "(1) the defendant made a statement; (2) the

statement is false or fraudulent; (3) the statement is material; (4) the defendant made the statement knowingly and willfully; and (5) the statement pertained to an activity within the jurisdiction of a federal agency." *United States v. Dedman*, 527 F.3d 577, 598 (6th Cir. 2008).

Defendant alleges that there was insufficient evidence presented by the Government to support her conviction. She claims as follows:

> The government's case, though filtered through the use of three separate charges, required the jury to answer the following questions in the affirmative: did [Defendant] misrepresent her physical abilities and return to work or volunteer activities and, if so, was that misrepresentation material? The answer to both questions is no, even when viewed in the light most favorable to the government. The jury's verdict to the contrary is not supported by the evidence.

Pet'r's Br. at 36. She does not appear to contest the *actus reus* elements of each of her convictions. Therefore, Defendant's claim amounts to an argument that there is insufficient evidence for the jury to have found beyond a reasonable doubt that she possessed an intent to deprive a victim of money or property, that she knowingly stole something of value to the United States, and that she knowingly and willfully made a false statement to a government agency. She claims that due to her diminished capacity defense, the good faith defense as to the first charge, and the evidence of her physical and mental disabilities, even when viewed in the light most favorable the prosecution, the evidence was insufficient to establish knowledge, willfulness, and intent.[5] Additionally, Defendant claims that Dr. Parikh's testimony proved that she had suffered

---

[5]Additionally, Defendant asserts an argument regarding society's views of mental illness. She claims these views can be damaging to criminal defendants because "'[j]urors . . . exhibit the twinned views that mental illness is a failure of individual responsibility and that the punishment of people with mental illnesses reinforces the responsibility norm.'" Pet'r's Br. at 40 (quoting Amanda C. Pustilnik, *Prisons of the Mind: Social Value and Economic Inefficiency in the Criminal Justice Response to Mental Illness*, 96 J. Crim. L. & Criminology 217, 246 (2005)). Defendant additionally alleges that the Government took advantage of this perspective on mental

from mental illness for decades and that she spent time in her family's store for medical reasons, not realizing that what she was doing constituted work. Finally, she concludes by arguing that "[t]he jury's verdict required it to irrationally disregard unchallenged expert medical evidence and premise its verdict upon [Defendant]'s outward physical manifestations alone to conclude she intended to defraud BWC and SSA." *Id.*

It is clear from the record that Defendant was able to do some amount of work, that she took some leadership roles at Devotice and Devotice & La'Char, that she often held herself out as a business owner, and that she made false statements to the government regarding her ability to work. Although Defendant did not receive direct salary for her work, and it is not entirely clear from the direct evidence that Defendant possessed the requisite intent, under this deferential standard of review, it is difficult to find that Defendant can succeed on her insufficient evidence claim. In order for her to succeed, this Court must find that no reasonable juror, after weighing the extensive evidence of Defendant's conduct and making credibility determinations based on witness testimony, could find beyond a reasonable doubt that Defendant intended to misstate her ability to work in order to obtain benefits from the government. There is sufficient evidence in the record for at least some reasonable jurors to have made such a finding, and that is the standard of review this Court must apply. At the very least, a reasonable juror could have found that Defendant was "reckless in h[er] disregard for the truth of the statements that [s]he made . . . to obtain [the government's] money." *United States v. Kennedy*, 714 F.3d 951, 958 (6th Cir. 2013) (holding that the prosecution may establish the intent element for mail fraud by demonstrating that the defendant was reckless)).

---

illness by presenting only snapshots of Defendant's behavior to show that "mental illness is not always manifested physically or obviously to others." Pet'r's Br. at 42.

"Under this highly deferential standard, we conclude that a rational trier of fact could have found the existence of intent to defraud beyond a reasonable doubt based on the evidence presented." *Boring*, 557 F.3d at 712 (internal citation and quotation marks omitted). Therefore, this Court affirms each of Defendant's convictions.

**C.       Calculation of Loss and Restitution Amounts**

Defendant asserts that the district court imposed a procedurally unreasonable sentence by improperly calculating loss and restitution amounts owed to the BWC, SSA, and Ohio Edison.

**1.       Standard of Review**

"Whether imposition of restitution is permissible under the circumstances is reviewed de novo, but the amount of restitution is reviewed for abuse of discretion." *United States v. Kumar*, 750 F.3d 563, 566 (6th Cir. 2014). *See also United States v. Wendlandt*, 714 F.3d 388, 393 (6th Cir. 2013) (internal quotation marks omitted) (this Court "review[s] a district court's sentence for abuse of discretion, whether inside, just outside, or significantly outside the Guidelines range, and for both procedural and substantive reasonableness."). We may only find that an abuse of discretion occurred if "a ruling is based on an error of law or a clearly erroneous finding of fact, or when the reviewing court is otherwise left with the definite and firm conviction that the district court committed a clear error of judgment." *Kumar*, 750 F.3d at 566. In making such a determination, this Court "review[s] the district court's factual findings for clear error and its legal conclusions de novo." *United States v. Angel*, 576 F.3d 318, 320 (6th Cir. 2009).

Restitution is used as a remedy "not to punish the wrongdoer, but to restore the victim, whose recovery is therefore limited to actual losses proximately caused by the wrongdoing." *Kumar*, 750 F.3d at 567. In fact, "[t]he restitution statutes authorize restitution for losses to victims and 'require[] that the restitution award be based on the amount of loss actually caused

by the defendant's offense.'" *United States v. Healy*, No. 11-CR-138-KKC, 2012 WL 3483296, at *1 (E.D. KY Aug. 13, 2012) (quoting *Boring*, 557 F.3d at 713) (brackets in original). Defendant alleges that the district court improperly calculated the amount of loss suffered by BWC, Ohio Edison, and the SSA, which led to an inaccurate offense level computation and an inappropriately high restitution award. On the other hand, "[t]he method used to calculate loss is reviewed de novo." *Wendlandt*, 714 F.3d at 393. "When applying section 2B1.1(b)(1) to determine the amount of loss, the district court need only make a reasonable estimate of the amount" based on the available evidence. *United States v. Jones*, 641 F.3d 706, 712 (6th Cir. 2011) (internal quotation marks omitted). The government's burden before the district court was to prove the amount of loss by a preponderance of the evidence. *Id.* "[A] trial court's finding as to amount [of loss] will be upheld on appeal unless 'outside the universe of acceptable computations.'" *United States v. Poole*, No. 98-6606, 188 F.3d 510 (table) 1999 WL 644147 at *4 (6th Cir. 1999) (quoting *United States v. Fleming*, 128 F.3d 285, 287 (6th Cir. 1997)).

Finally, as Defendant points out, "[a]n error with respect to the loss calculation is a procedural infirmity that typically requires remand." *Warshak*, 631 F.3d at 328 (6th Cir. 2010)).

**2.    Analysis**

The district court examined the record before calculating the loss amount in this case. The court stated,

> I do find by a preponderance of the evidence supports the Government's position in regard to the fact that they not only zero in on a specific period and not the whole period, which Ms. Stephens-Miller received benefits, but that also there was sufficient evidence in the record from trial testimony, and as suggested by the Assistant United States Attorney, to support the fact that during the period in question that she was able to work.
>
> This was not a one-day or a two-day kind of thing, but it was something she did throughout the period, which they focused on.

> Some of that came from her; some of it came from other items of evidence, and some of it came from the surveillance. Even though it was a limited period of surveillance, it produced evidence that went beyond that period.
>
> So I find that a preponderance of the evidence does support a finding that should be the ten-level enhancement.

(R. 94, 3/12/2013 Sentencing Tr., at PageID# 722–23.) The court adopted the loss amount calculations set forth in the PSR to find that the victims (SSA, BWC, and Ohio Edison) lost $170,047.47 between August 1996 and June 2008 due to Defendant's misrepresentations regarding her ability to work.[6] With that in mind, the district court started out with a base offense level of 7, and then added ten levels pursuant to U.S.S.G. § 2B1.1(b)(1)(f), which states that ten levels are to be added where the loss amount is more than $120,000. The district court varied downward to ten months of imprisonment and three years of supervised release for each charge, to run concurrently. Additionally, the district court awarded restitution in the amount of $170,047.47.

Defendant asserts that the district court erred in adopting the total amount of loss from the PSR. First, she claims there is insufficient evidence of her work-related conduct during the entire period from 1996 through 2008 for the district court to have found by a preponderance of the evidence that she was entitled to absolutely no benefits during that period. Specifically, Defendant claims that because the stores were not open all day, every day throughout the twelve-year period, because the government did not conduct surveillance during the entire period, because she did not receive compensation for whatever work she did complete during that time, and because there was no expert testimony presented by the government to assess a monetary

---

[6]Specifically, the PSR stated that the impact on the victims consisted of the following amounts: $18,083.00 from the SSA between 2006 and 2008, $88,075.08 from BWC from September 1, 1996 through the termination of benefits in 2008, and $63,259.39 from Ohio Edison between September 1, 1996 and the termination of benefits in 2008.

value to her conduct in the stores, "[t]he suggested total loss calculation is overstated and predicated upon the mistaken belief that [Defendant] consistently engaged in prohibited volunteer or work activity" during the period in question. Pet'r's Br. at 45. Defendant does not point to any authority from this Court or any other court requiring the government to establish a monetary value through expert testimony. Instead, the sentencing judge need only make a reasonable estimate, and "is in a unique position to assess the evidence and estimate the loss based upon that evidence." *United States v. Josic*, 324 F. App'x 472, 477 (6th Cir. 2009) (quoting U.S.S.G. § 2B1.1 cmt. 3(C)).

During Defendant's trial, the government presented a great deal of evidence suggesting that Defendant was not entitled to any benefits during the latter portion of the twelve-year period, from 2005 through 2008. Although there is much less evidence available in the record regarding her activity from 1996 through 2005, we must review the district court's assessment of the evidence and estimation of the loss amount for an abuse of discretion, and there appears to be enough evidence in the record to establish that Defendant worked throughout the relevant time period. In 2006, Defendant admitted to the BWC undercover agents that she had been running her store for nine years, and that admission thus covers the period from approximately 1997 through 2006, when the BWC's investigations began. Her own statement, therefore, demonstrates that Defendant was at least able to and did do some amount of work during that time period. Dawkins testified that on a number of occasions before 2004, she and her daughter went to the store to purchase some African clothes for her daughter's wedding. On each occasion, Defendant met her at the store and assisted her as she shopped, and Defendant made and sold to her the crown used in her daughter's wedding. Dawkins also stated that Defendant made an offer in 2000 to go into business with her when the store was located on North Main.

(*Id*.) Also in the record and described above is Bryant's testimony regarding the 1996 "Brides of Color" magazine, which featured Devotice's products and a gown that was designed by Defendant herself.

Although Defendant asserts in her brief that the government failed to present any evidence that Defendant volunteered or worked in any store between 1998 and 2005[7], her admission to Bryant that the store had been operating for the past nine years and the fact that Dawkins purchased articles from Defendant sometime before 2004 indicates that she did, in fact, work or volunteer during that time period.

While there is no evidence in the record to demonstrate that Defendant received remuneration during this time, that is not relevant for determining whether Defendant was working or able to work. In fact, neither Defendant nor Dawkins received remuneration for their work in the store during the relevant time period. Although Defendant and Dawkins were in the business because they "enjoyed the fashion," Dawkins explained that she "knew that in five years [she] figured it would be making some money somewhere along the line, but at that particular time, no, it did not matter then because [she] was working towards that goal." (R. 122, 12/7/2012 Trial Tr., at 1548–49.) Although Barbara Marshall, a supervisor of health and absence management at Ohio Edison, testified that "work would be any type of employment where an individual's providing a service or consultation, an occupation, business, where they're receiving some form of remuneration for the service," (R. 121, 12/6/2012 Trial Tr., at PageID# 1226), Michael Pagan, an operations supervisor at the SSA, testified that even if an individual does not receive any income, the SSA can still calculate the value of work. He explained that "work [put] into a business is still going to have some value, even if the company's taking a net loss for the

---

[7]Defendant's witnesses indicated that Devotice closed in 1998 and did not reopen until 2005.

year, it's still going to have some value. It's still considered work and we've got to figure out whether or not it's substantial or not because if it's substantial you no longer meet the definition of disability." (*Id*. at PageID# 1251) Based on the evidence available to the court, a reasonable inference could have been made that neither Dawkins nor Defendant were paid for their work because they were reinvesting money in the store to grow the store's business and eventually turn a profit. And this could still qualify as work.

The relevant consideration is whether Defendant was able to and did work during the time period, not whether she worked a full-time or part-time job. Had Defendant been able to produce records indicating that she only worked part-time, the district court could have considered those records in making its loss-amount calculation. Instead, Defendant did not present any evidence indicating the amount of time she spent working or volunteering in the store. The government put forth some evidence that Defendant was taking responsibility for the store at various points during the period from 1996 through 2008; the court assessed this information, and adopted the calculation set forth in the PSR. Although the government did not present evidence that Defendant worked every day during that twelve-year period, there was sufficient evidence for the court to find by a preponderance of the evidence that Defendant was able to work from 1996 through 2008 and that "[t]his was not a one-day or a two-day kind of thing, but it was something she did throughout the period." (R. 94, 3/12/2012 Sentencing Tr., at PageID# 723.)

Second, Defendant claims that even if she was only entitled to some of the benefits she received from 1996 through 2008, this Court's decisions in *Boring* and *United States v. Waldren*, 431 F. App'x 374 (6th Cir. 2011), require the district court to adjust the loss amount calculation. Defendant argues that "[t]he suggested total loss calculation is overstated and predicated upon

33

the mistaken belief that [Defendant] consistently engaged in prohibited volunteer or work activity" during the entire period in question. Pet'r's Br. at 45.

*Boring* and *Waldren* require the district court to calculate a restitution award "equal to the total amount [Defendant] received minus the amount [s]he received when [s]he was legitimately . . . unable to work. *Boring*, 557 F.3d at 713. "The rationale behind [the *Boring*] decision was that restitution must account for loss that was actually *caused* by the defendant's false statements." *Waldren*, 431 F. App'x at 378. This does not necessarily require an offset in all cases. In the instant case, the jury convicted Defendant based on her conduct charged in the indictment, for which there was evidence to demonstrate that Defendant was able to work to some extent during the relevant time period. (R. 1, Indictment, at PageID# 3 ("Beginning on or about September 1, 1996, to June 7, 2008, . . . the defendant, BERNICE D. STEPHENS-MILLER, devised and intended to devise a scheme and artifice to defraud and obtain money and property from Ohio BWC by means of false and fraudulent pretenses, representations and promises.").) This is the period during which she was not entitled to benefits.

In *Boring*, the district court initially calculated the restitution amount as the entire amount lost over the period of time while the defendant received benefits. This Court held that the calculation was improper because there was a period of time within that larger period during which the defendant was actually entitled to receive benefits. Therefore, the *Boring* Court remanded the case because "[t]he district court may not include in its calculation of a restitution award the worker's compensation payments to which Boring was legitimately entitled, since those do not constitute losses to the victim and thus are not properly the subject of restitution." 557 F.3d at 714.

In the instant case, the district court only calculated the restitution amount based on the amount lost by the victims during the time for which the jury convicted. The "offset" had already occurred because the district court did not award restitution for all of the benefits Defendant received between 1976, when she first began receiving benefits, and 2008.

Defendant carried the burden of "persuading th[e] Court that the evaluation of the loss was not only inaccurate, but outside the realm of permissible calculations." *United States v. Gray*, 521 F.3d at 543. Defendant has failed to carry this burden, and because we may only reverse under the abuse of discretion standard if we are "left with the definite and firm conviction that the trial court committed a clear error of judgment," *United States v. Batti*, 631 F.3d 371, 379 (6th Cir. 2011), we must affirm the district court's loss calculation because it was not outside the realm of permissible calculations.

## III.

## CONCLUSION

For the foregoing reasons, this Court **AFFIRMS** the convictions and sentence imposed in this case.